

ORIGINAL

FILED

IN THE UNITED STATES COURT OF FEDERAL CLAIMS NOV 2 0 2013

*Bid Protest*

U.S. COURT OF
FEDERAL CLAIMS

JORDAN POND COMPANY, LLC,           )
                                    )
            Plaintiff,              )
                                    )       No. _____
      v.                            )
                                    )       13-913 C
THE UNITED STATES,                  )
                                    )
            Defendant.              )
                                    )

## COMPLAINT

1.      This Court has jurisdiction over this bid protest action pursuant to 28 U.S.C.

§ 1491.


2.      Plaintiff Jordan Pond Company, LLC is a wholly-owned subsidiary of The Acadia

Corporation (collectively "Jordan Pond Co.") and is a small business corporation established

under the laws of Maine.  Jordan Pond Company LLC was established for the purpose of bidding

on the contract at issue in this matter, but has access to and benefit of the same resources and

experience as The Acadia Corporation.


3.      Defendant is the United States of America acting through the National Park Service,

Department of the Interior (hereinafter "NPS").


4.      This suit arises out of NPS's improper actions in the evaluation of proposals received in

response to its solicitation for offers to enter into a contract with NPS to operate food, beverage

and retail services at Jordan Pond House, Cadillac Mountain and Thunder Hole in Acadia National Park.

## Background

5.      Acadia National Park is located in the state of Maine on Mount Desert Island, Isle de Haut, parts of Baker Island and the Schoodic Peninsula.  The Park was originally created as Lafayette National Park in 1919 and is the oldest National Park east of the Mississippi River. In 1929, it was renamed Acadia National Park.

6.      Acadia National Park has a rich historic tradition, and the mission of Acadia National Park, as defined in the 1992 General Management Plan set out below, drives it current management:

> The National Park Service at Acadia National Park protects and preserves outstanding scenic, natural, scientific, and cultural values for present and future generations through programs, facilities and services.  It also provides programs and opportunities for non-consumptive, resource-based recreation and education for an increasingly urban population.

7.      Most of the visitors to Acadia National Park come from the United States, and as between the various states, the highest number of visitors come from Massachusetts and Maine.

8.      Since the 1870s, long before Acadia National Park was even created, the Jordan Pond House restaurant has been in operation in various incarnations.

9.      The Jordan Pond House restaurant is located amid the historic properties of Acadia National Park, such as the Carriage Road and Jordan Pond Gatehouse, and is an integral part of the cultural landscape of the area.

10.     The food service in the Jordan Pond House has been an iconic feature of the area since the late 1800s when it served the summer residents on Mount Desert Island.  These services have been carried through to the current time, where they are still time-honored features of the current concession contract.

11.     Jordan Pond Co. has been providing services at Acadia National Park for the past eighty years, and is intimately familiar with the unique aspects of these operations and the history and traditions within Acadia National Park.

12.     Jordan Pond Co.'s most recent concession contract ended on December 31, 2012.

13.     Jordan Pond Co.'s contract was extended for a one-year period, to December 31, 2013.

*Issuance of the Prospectus*

14.     On July 17, 2012, NPS issued a Prospectus seeking proposals to operate food and beverage and retail services at Jordan Pond House, Cadillac Mountain and Thunder Hole within Acadia National Park under a new 10-year contract.

15.     The Prospectus was subject to the terms of the National Park Service Concessions

Management Improvement Act of 1998, 16 U.S.C. § 5951 *et seq.* ("NPS Concessions

Management Improvement Act"), and its implementing regulations at 36 C.F.R. Part 51.

16.     The NPS Concessions Management Improvement Act requires NPS to pursue a

competitive selection process for awarding concession contracts by issuing a Prospectus.  16

U.S.C. § 5952(2).

*Requirements of the Prospectus*

17.     The Prospectus contained five Principal Selection Factors and two Secondary Selection

Factors.

18.     Based on NPS's evaluation, an offeror's proposal could receive 0-5 points for Principal

Selection Factors 1-4, 0-4 points for Principal Selection Factor 5, 0-3 points for Secondary

Selection Factor 1 and 0-2 points for Secondary Selection Factor 2.

19.     Principal Selection Factor 1 was entitled "The Responsiveness of the Proposal To The

Objectives, as described in the Prospectus, of Protecting, Conserving, and Preserving Resources

of the Park."

20.     Principal Selection Factor 1 focused on visitor and employee resource education and

vehicle management.

21.     Subfactor 1(a) of Principal Selection Factor 1 asked offerors to describe their resource training for their employees, including a description of how the offeror would provide information to visitors regarding protection of the natural resources and safety.

22.     Subfactor 1(b) of Principle Selection Factor 1 stated that vehicular parking in the Jordan Pond House area was restricted to approved parking areas and requested offerors to describe strategies to manage traffic congestion around the Jordan Pond House area.

23.     Principal Selection Factor 2 was entitled "The Responsiveness of the Proposal To The Objectives, As Described in the Prospectus, of Providing Necessary And Appropriate Visitor Services At Reasonable Rates."

24.     Principal Selection Factor 2 stated that the objectives of the factor included retail operations, healthy and sustainable food and tribal relationships.

25.     Subfactor 2(a) of Principal Selection Factor 2 focused on retail operations and required offerors to provide a proposed merchandising plan, including how and where the offeror would offer grab-and-go food items.

26.     Subfactor 2(a) of Principal Selection Factor 2 also required offerors to propose merchandise at "a reasonable range of price points."

27.     Subfactor 2(b) of Principal Selection Factor 2 focused on providing healthy and sustainable food and required offerors to describe how they would provide high-quality food offerings that met the "Healthy Choice" options requirement through foods obtained locally, as required by the Operating Plan in the Draft Contract.

28.     Subfactor 2(c) of Principal Selection Factor 2 focused on local American Indian tribes in Maine and ensuring visitors understood the significance of areas within the Park to the Maine tribes as well as providing for the sale of Maine tribe items associated with the area.

29.     Principal Selection Factor 3 was entitled "The Experience And Related Background Of The Offeror, Including The Past Performance And Expertise Of The Offeror In Providing the Same Or Similar Visitor Services As Those To Be Provided Under the Concession Contract."

30.     In Subfactor 3(a) of Principal Selection Factor 3, NPS stated that it "is interested in preserving the unique history of the Jordan Pond House and also ensuring its traditional 'tea house' service of the 1930s continues to appeal to contemporary visitors []. During a short operating season, the Concessioner serves a large volume of visitors at the Jordan Pond House. The Service desires a Concessioner with capabilities to adapt quickly to the existing operating environment and plan for changes to keep the tradition at the Jordan Pond House fresh."

31.     Subfactor 3(a) of Principal Selection Factor 3 also required offerors to provide examples of their experience in the operation and management of dining locations that demonstrate their

ability to operate the Jordan Pond House, "particularly its concentrated visitor use patterns and its traditional 'tea house' service."

32.     The Draft Operating Plan for the new contract stated that "[t]he Concessioner must offer grab-and-go menu items" but that those items must be offered "within the Jordan Pond House retail area," not within the Jordan Pond House restaurant area.

33.     Principal Selection Factor 4 was entitled "The Financial Capability Of The Offeror To Carry Out Its Proposal."

34.     Principal Selection Factor 5 was entitled "The Amount Of The Proposed Minimum Franchise Fee And Other Forms of Financial Consideration To The Director."

35.     Secondary Selection Factor 1 was entitled "The Quality of the Offeror's Proposal To Conduct Its Operations In A Manner That Furthers The Protection, Conservation, and Preservation of the Park and Other Resources Through Environmental Management Programs And Activities, Including, Without Limitation, Energy Conservation, Waste Reduction, and Recycling."

36.     Secondary Selection Factor 2 was entitled "Providing Suitable Living Environments For Concessioner Personnel."

37.     Proposals were due by November 20, 2012.

38.     On November 15, 2012, Jordan Pond Co. submitted a proposal in response to the

Prospectus.


39.     NPS's proposal evaluation group met in Philadelphia in December 2012 to review the

proposals received.


40.     None of the members of the evaluation group were from Acadia National Park.


*Decision to select a proposed awardee and debriefing*


41.     Ten months after the proposal due date, by letter dated September 18, 2013, NPS

informed Jordan Pond Co. that NPS had selected a New Mexico-based company, Dawnland,

LLC, for award of the concession contract pursuant to the Prospectus.


42.     The Prospectus stated that offerors could request either a pre- or post-award debriefing

after being notified of the selection of the intended awardee.  As stated in the Prospectus:

**Availability of a Debriefing**

Offerors may request in writing either a pre- or post-award debriefing after
receiving the Notification of Selection/Non-Selection letter. A pre-award
debriefing occurs after the selection of the best proposal that was timely submitted
and responsive, but before award of the concession contract. Award of a
concession contract does not occur until the competitive process has been
completed and both the selected Offeror and the Service have signed the
concession contract (36 C.F.R. Part 51). If Offerors wish to request a debriefing, a
written request for either a pre- or post-award debriefing must be received within
14 calendar days from receiving the Notification of Selection/Non-Selection
letter. The Service will make every effort to debrief Offerors as soon as

practicable after receiving a request. Circumstances may cause a pre-award debriefing to be delayed until after the contract award. If a preaward debriefing is delayed until after contract award, the Service will provide a post-award debriefing.  A debriefing is not an opportunity for negotiation, amendment, supplementation or reevaluation of any proposal.

43.     Jordan Pond Co. sought to obtain as much information as possible about NPS's

evaluation of its proposal as well as NPS's evaluation of the other proposals it received.

44.     NPS refused to provide to Jordan Pond Co. any copies of its evaluation documents, even

redacted versions.

45.     NPS refused to disclose the names of entities which submitted proposals in response to

the Prospectus.

46.     NPS refused to disclose the names of individuals who evaluated the proposals submitted

in response to the Prospectus.

47.     NPS stated that it did not retain any minutes of the evaluation meetings.

48.     On September 23, 2013, Jordan Pond Co. requested a pre-award and post-award

debriefing from NPS.

49.     The federal government was then partially shut down from October 1-16, 2013.

50.     Jordan Pond Co. followed up its September request as soon as the partial government

shutdown ended in a letter dated October 18, 2013.


51.     On October 18, 2013, Ethan McKinley of NPS responded in an email to Jordan Pond Co.

and stated that NPS would provide Jordan Pond Co. with a debriefing "in the next few weeks."

That email stated:

> Good Afternoon, Dave.
>
> Thank you for submitting your request.  As we spoke about in September and as
> indicated in the ACAD001-13 Prospectus (see Proposal Instructions, Section 8),
> "Offerors may request in writing either a pre- or post-award debriefing..."
>
> The two options are outlined below.  While the pre-award debriefing contains less detail,
> it would be available within the next few weeks.  Inversely, the post-award debriefing
> contains significantly more information, but would be available in early 2014.  Please let
> me know which would be preferable.
>
> **Pre-award Debriefings Include:**
>
> - a general comparison of the quality of the debriefed offeror's proposal and of the
>   selected proposal, under the selection factors included in the applicable prospectus;
>   and
> - a description of the selection evaluation process.
>
> **Pre-award debriefings will not include:**
>
> - the number and identity of offerors;
> - the specific content of any proposal;
> - the point scores assigned to any proposal; and
> - any information prohibited from disclosure by law, including, without limitation,
>   commercial and financial information that is privileged or confidential.
> - Content of Post-Award Debriefings
>
> **Post-award debriefings will include:**
>
> - the number and identity of offerors;
> - a general comparison of the quality of the debriefed offeror's proposal and of the
>   proposal awarded the concession contract under the selection factors included in the
>   applicable prospectus;

- the point scores assigned under the applicable selection factors of the debriefed offeror's proposal and of the proposal awarded the concession contract; and
- a description of the selection evaluation process.

**Post-award debriefings will not include:**

- the specific content of any proposal, unless the debriefing is for the successful offeror;
- a general comparison of the quality of the other proposals; and
- any information prohibited from disclosure by law, including, without limitation, commercial and financial information that is privileged or confidential.

Best Regards,
Ethan


52.     Jordan Pond Co. responded to NPS on October 21, 2013 that Jordan Pond Co. preferred

to have both debriefings in order to better understand the basis for NPS's decision.


53.     On October 21, 2013, Ethan McKinley of NPS responded that NPS would only provide

one or the other debriefing, not both.


54.     Because Jordan Pond Co. wanted to obtain information about NPS's evaluation as

promptly as possible, Jordan Pond Co. informed NPS that Jordan Pond Co. wanted a pre-award

debriefing.


55.     In an email sent November 12, 2013, Ethan McKinley of NPS stated to Jordan Pond Co.

that the pre-award debriefing had been delayed by the partial government shutdown and NPS

expected to provide that debriefing either later in the week of November 12-15, 2013 or early in

the week of November 18-22, 2013.

56.     As of the time of this filing, Jordan Pond Co. has not received any debriefing from NPS.

57.     Pursuant to 16 U.S.C. § 5952(6), because the proposed contract has anticipated annual gross receipts in excess of $5,000,000, NPS is required to submit the proposed concession contract with Dawnland, LLC to the Committee on Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate and shall not award any contract until at least 60 days after that submission.

58.     To date, to the best of Jordan Pond Co.'s knowledge, NPS has not submitted the proposed contract to the congressional committees pursuant to 16 U.S.C. § 5952(6).

59.     The contract, therefore, has not yet been awarded and cannot be awarded for at least 60 days.

60.     NPS does not provide an administrative level appeal process for non-selected offerors to challenge its award decisions.

61.     As a result, Jordan Pond Co. was required to file its protest in this Court.

62.     But for the errors made by NPS in its evaluation of the proposals, as discussed below, Jordan Pond Co. would have received the highest evaluation score and would have been selected for award of the contract.

## Count I

*(NPS violated its own evaluation procedure)*

63.     Jordan Pond repeats and re-alleges the allegations in paragraphs 1-62 as if set forth fully herein.

64.     To ensure that it properly evaluated proposals received, as part of its evaluation procedure NPS appointed a technical advisor to the evaluation panel who was familiar with Acadia National Park.

65.     By having a local technical advisor who was familiar with the unique aspects of Acadia National Park, such as its natural and cultural landscape and its General Management Plan, NPS would avoid the problem of the evaluation panel giving points to an offeror for proposing items that appeared attractive on their surface, but in fact were not viable or would be rejected by the local NPS officials at Acadia National Park.

66.     The role of the technical advisor was to advise the members of the evaluation group, none of whom were from Acadia National Park, as to the feasibility of any proposed terms based on Acadia National Park's historic operations, its goals and the limitations in its General Management Plan.

67.     However, upon information and belief, the technical advisor did not attend any meetings of the evaluation panel and was never consulted by the evaluation panel as to the feasibility of

the terms of the proposals, even though none of the members of the evaluation panel were from Acadia National Park.

68.     As a result of this failure to implement procedural safeguards, the evaluation group gave credit to Dawnland, LLC for proposed operations that were not feasible or consistent with the historic operations at Acadia National Park or its General Management Plan.

69.     For example, upon information and belief, Dawnland, LLC proposed to increase parking areas within Acadia National Park and supply its food operations with twice as much locally grown food as Jordan Pond Co. currently purchases, neither of which were possible given the constraints of Acadia National Park and the local area and the fact that Jordan Pond Co. was obtaining at least 60% of its foods from local sources.

70.     If NPS had implemented these procedural safeguards, Jordan Pond Co.'s proposal would have been assessed more points than Dawnland, LLC's proposal and Jordan Pond Co. would have been selected for award of the contract.

## Count II

*(NPS failed to properly evaluate the proposals pursuant to Principal Selection Factor 1)*

71.     Jordan Pond repeats and re-alleges the allegations in paragraphs 1-70 as if set forth fully herein.

72.     Principal Selection Factor 1 evaluated "The Responsiveness of the Proposal To The Objectives, as described in the Prospectus, of Protecting, Conserving, and Preserving Resources

of the Park" and the offeror's proposal was assigned a score of between 0 - 5 points for this factor.

73.     Subfactor 1(b) of Principal Selection Factor 1 stated that the concessioner must "restrict vehicular parking (both employees and guest) to paved or graveled parking areas approved by the Superintendent" and requires offerors to "describe specific operating details for three strategies beyond the requirements of the Draft Operating Plan you will use to assist the NPS in managing the traffic congestion in and around the Jordan Pond House area."

74.     Upon information and belief, Dawnland, LLC proposed to expand the parking areas beyond those approved by the Superintendent and in a manner contrary to Acadia National Park's General Management Plan even though these areas cannot be increased due, in part, to the historical nature of some of the area.

75.     Dawnland, LLC's proposal did not demonstrate a proper understanding of how to manage vehicles in Acadia National Park, as required by the Prospectus.

76.     Therefore, Jordan Pond Co.'s proposal should have been assigned a higher score than Dawnland, LLC's proposal under Principal Selection Factor 1 and, had NPS properly evaluated the proposals, Jordan Pond Co. would have been selected for award.

## Count III

*(NPS failed to properly evaluate the proposals pursuant to Principal Selection Factor 2)*

77.    Jordan Pond repeats and re-alleges the allegations in paragraphs 1-76 as if set forth fully herein.

78.    Principal Selection Factor 2 evaluates "The Responsiveness of the Proposal To The Objectives, As Described in the Prospectus, of Providing Necessary And Appropriate Visitor Services At Reasonable Rates" and the offeror's proposal is assigned a score of between 0 - 5 points for this factor.

79.    Subfactor 2(a) of Principal Selection Factor 2 required offerors to propose merchandise at "a reasonable range of price points."

80.    Upon information and belief, Dawnland, LLC did not propose merchandise at a reasonable range of price points at the store at Thunder Hole, but instead proposed an eco-store which would only sell items that were at an excessively high price point.

81.    Subfactor 2(b) of Principal Selection Factor 2 focused on requiring offerors to provide healthy and sustainable food and required offerors to describe how they would provide high-quality food offerings that met the "Healthy Choice" options requirement.

82.     Upon information and belief, Dawnland, LLC proposed to provide these foods by using locally and regionally grown foods.

83.     Under the current contract, Jordan Pond Co. uses the maximum available amount of locally and regionally obtained food sources and sourced at least 60% of its food from local sources.

84.     Due to the reduced growing season and limited number of local growers, the local and regional food sources are in fact unable to fully meet the demands within Acadia National Park.

85.     Upon information and belief, Dawnland, LLC proposed to double the amount of locally and regionally grown foods in its operations as compared to the operations of Jordan Pond Co.

86.     This proposal was simply not valid or possible because Jordan Pond Co. sourced at least 60% of its foods from local sources.

87.     In addition, Dawnland, LLC's assertions that it would procure more local foods for its operations than Jordan Pond Co. is also not possible.

88.     Subfactor 2(b) under Principal Selection Factor 2 also required offerors to "[p]rovide a proposed menu for the Jordan Pond House Restaurant and the grab-and-go food items, including associated prices."

89.     Dawnland, LLC proposed a menu which will result in increased food prices and lengthened food preparation times at Jordan Pond House Restaurant.

90.     In addition, Dawnland, LLC proposed providing hot popovers, the most iconic food at Acadia National Park, at the grab-and-go area as part of the high quality foods Dawnland, LLC would offer.

91.     However, as stated in the Operating Plan, the concessioner may not hold popovers for more than 15 minutes and not serve them beyond this time limit.  This is due to the fact that popovers cannot retain their shape and optimum flavor for more than this period of time.

92.     Therefore, Dawnland, LLC's proposal to serve hot popovers at the grab-and-go area was not feasible and demonstrated a significant lack of understanding of the key requirements of the contract, specifically preserving the unique history of the Jordan Pond House and ensuring the traditional tea house experience of the 1930s.

93.     The Prospectus also referred to the need for the concessioner to educate visitors about the five Native American tribal communities of Maine and constructively promote their history and culture.

94.     NPS's objectives as stated in the Prospectus included that NPS "wants visitors to understand the significance of Park locations (e.g., Cadillac Summit) for American Indian tribes

in Maine. Related to this, Park visitors should have ample opportunity to purchase a wide variety of handicraft items produced by members those tribes at different price points."

95.    In Subfactor 2(c), entitled "Tribal Relationships," NPS required offerors to "identify three strategies you will use to achieve the Service's objective []. Examples could include proposed demonstrations of Maine tribe practices as they relate to specific Park locations, proposed signage with sale of Maine tribe items associated with the area, and photographs of proposed sample retail offerings."

96.    The Abbe Museum is a non-profit museum that operates in Acadia National Park, as well as outside it, and promotes the five Native American tribal communities of Maine.

97.    In its proposal, Dawnland, LLC's stated that it would establish a 400 square foot gallery space to sell Native American art.

98.    However, Dawnland, LLC's efforts will directly compete with, and therefore cause harm to the Abbe Museum.

99.    Dawnland, LLC did not propose to work collaboratively with the Abbe Museum.

100.   By doing so, Dawnland, LLC will cause harm to the five Native American tribal communities of Maine and diminish their ability to promote their history and culture.

101.    Jordan Pond Co. proposed to work collaboratively with the Abbe Museum, as it has done in the past.

102.    Jordan Pond Co.'s established cooperation with the Abbe Museum has and will continue to constructively promote the history and culture of the five Native American tribal communities of Maine.

103.    In addition, a key element to providing necessary and appropriate visitor services pursuant to Principal Selector Factor 2 is the staff of the concessioner.

104.    Dawnland, LLC informed Jordan Pond Co. that Dawnland, LLC intended to hire all of Jordan Pond Co.' staff.

105.    Thus, Dawnland, LLC proposed using the exact same staff as Jordan Pond Co., but stated that it would merely try to obtain that staff and could not guarantee that it would.

106.    Jordan Pond Co. already has that staff employed, and thus, given this fact, Jordan Pond Co. should have received a higher score than Dawnland, LLC based on this fact.

107.    A key element to providing necessary and appropriate visitor services are the vendors used by concessioner.

108.    Dawnland, LLC informed Jordan Pond Co. that Dawnland, LLC intended to use Jordan Pond Co.'s vendors.

109.    Dawnland, LLC proposed using the same vendors as Jordan Pond Co., but did not even know who those vendors were.

110.    Jordan Pond Co. specifically identified its vendors and already has agreements with those vendors and an established working relationship.

111.    Therefore, for the reasons set forth above, Jordan Pond Co.'s proposal should have been assigned a substantially higher score than Dawnland, LLC's proposal under Principal Selection Factor 2 and, had NPS properly evaluated the proposals, Jordan Pond Co. would have been selected for award.

**Count IV**

*(NPS failed to properly evaluate the proposals pursuant to Principal Selection Factor 3)*

112.    Jordan Pond repeats and re-alleges the allegations in paragraphs 1-111 as if set forth fully herein.

113.    Principal Selection Factor 3 evaluates ""The Experience And Related Background Of The Offeror, Including The Past Performance And Expertise Of The Offeror In Providing the

Same Or Similar Visitor Services As Those To Be Provided Under the Concession Contract" and the offeror's proposal is assigned a score of between 0 - 5 points for this factor.

114.     Subfactor 3(a) of Principal Selection Factor 3 stated that "[d]uring a short operating season, the Concessioner serves a large volume of visitors at the Jordan Pond House."

115.     Subfactor 3(a) of Principal Selection Factor 3 required offerors to provide examples of their experience in the operation and management of dining locations that demonstrate their ability to operate the Jordan Pond House, "particularly its concentrated visitor use patterns and its traditional 'tea house' service."

116.     Subfactor 3(a) of Principal Selection Factor 3 also required offerors to demonstrate "capabilities to adapt quickly to the existing operating environment" at Jordan Pond House.

117.     Jordan Pond Co. has unmatched experience in the operation and management of Jordan Pond House, "particularly its concentrated visitor use patterns and its traditional 'tea house' service."

118.     Dawnland, LLC has not operated a restaurant that serves more than half the number of daily patrons as occurs at Jordan Pond House.

119.     Dawnland, LLC does not have any experience in providing operations and management for areas that receive concentrated high volume visitor use, such as at Acadia National Park.

120.    In addition, upon information and belief, Dawnland, LLC proposed to hire the same employees as are currently working for Jordan Pond Co.

121.    However, Dawnland, LLC did not have commitments from all those employees that they would bring their experience to work for Dawnland, LLC.

122.    In addition, upon information and belief, Dawnland, LLC was unaware of whether a good general manager for their operations was even available and thus could not demonstrate the capability to adapt quickly to the existing operating environment at Jordan Pond House.

123.    Therefore, for the reasons set forth above, Jordan Pond Co.'s proposal should have been assigned a higher score than Dawnland, LLC's proposal under Principal Selection Factor 3 and, had NPS properly evaluated the proposals, Jordan Pond Co. would have been selected for award.

**Count V**

*(NPS failed to properly evaluate the proposals pursuant to PSF4)*

124.    Jordan Pond repeats and re-alleges the allegations in paragraphs 1-123 as if set forth fully herein.

125.     Principal Selection Factor 4 evaluated "The Financial Capability Of The Offeror To Carry Out Its Proposal" and the offeror's proposal is assigned a score of between 0 - 5 points for this factor.

126.     The Prospectus set forth an estimated initial investment of $2,074,800 which any new concessioner would have to incur to operate under the contract.

127.     Jordan Pond Co., as the incumbent concessioner, would not incur this expense.

128.     Therefore, Jordan Pond Co.'s proposal should have been assigned a higher score than Dawnland, LLC's proposal under Principal Selection Factor 4 and, had NPS properly evaluated the proposals, Jordan Pond Co. would have been selected for award.

## Count VI

*(NPS failed to properly evaluate the proposals pursuant to the Secondary Selection Factors)*

129.     Jordan Pond repeats and re-alleges the allegations in paragraphs 1-128 as if set forth fully herein.

130.     Secondary Selection Factor 1 evaluated "The Quality of the Offeror's Proposal To Conduct Its Operations In A Manner That Furthers The Protection, Conservation, and Preservation of the Park and Other Resources Through Environmental Management Programs

And Activities, Including, Without Limitation, Energy Conservation, Waste Reduction, and Recycling" and the offeror's proposal is assigned a score of between 0–3 points for this factor.

131.    Subfactor 1(b) for Secondary Selection Factor 1 required offerors to "identify your baseline percentage of purchases to meet the local and regional food sourcing standards" which were outlined in the draft Operating Plan and to "identify how you will increase the percentage of purchases over the term of the contract."

132.    Upon information and belief, Dawnland, LLC proposed to double the amount of local food that Jordan Pond LLC was purchasing under the current contract.

133.    However, due to the limited sources and the fact that Jordan Pond Co. already purchases at least 60% of its food from local sources, doubling this amount of locally grown foods is simply not possible.

134.    Therefore, Jordan Pond Co.'s proposal should have been assigned a higher score than Dawnland, LLC's proposal under Secondary Selection Factor 1 and, had NPS properly evaluated the proposals, Jordan Pond Co. would have been selected for award.

## Count VII

*(Dawnland, LLC's proposal was non-responsive)*

135.    Jordan Pond repeats and re-alleges the allegations in paragraphs 1-134 as if set forth fully herein.

136.    The Draft Operating Plan for the new contract stated that "[t]he Concessioner must offer grab-and-go menu items" but that those items must be offered "within the Jordan Pond House retail area," not within the Jordan Pond House Restaurant area.

137.    Based upon information and belief, Dawnland, LLC did not agree to offer grab-and-go menu items in the Jordan Pond House retail area, but instead agreed to offer grab-and-go items in the restaurant area of Jordan Pond House.

138.    Therefore, Dawnland, LLC's proposal was non-responsive and should not have been considered in the evaluation.

139.    In the alternative, Jordan Pond Co.'s proposal, which did agree to offer grab-and-go items in the retail area of the Jordan Pond House, should have been assigned more points than Dawnland, LLC's proposal and, had NPS properly evaluated the proposals, Jordan Pond Co. would have been selected for award.

## Count VIII

*(NPS violated the confidentiality of the evaluation)*

140.    Jordan Pond repeats and re-alleges the allegations in paragraphs 1-139 as if set forth fully herein.

141.    NPS asserted that the evaluation process and information set out in the proposals would be highly confidential.

142.    However, notwithstanding this assertion, confidential information related to the evaluation process and the proposals has been disclosed.

143.    These disclosures include the fact that, although NPS's evaluation procedure included appointing a technical advisor from Acadia National Park to ensure that the evaluators, who were not from Acadia National Park, did not give credit to any proposals which included terms that were not feasible at Acadia National Park, that technical advisor was never consulted in the evaluation process.

144.    These disclosures also included various aspects of the purportedly confidential proposals, such as Dawnland, LLC's proposal to increase parking spaces within the concession area.

145.    These disclosures demonstrate that confidential information was improperly being disclosed during the evaluation process prior to award, and these disclosures compromised the entire evaluation process.

146.    By improperly disclosing confidential information before the conclusion of the award process, NPS has violated its contractual obligation to fairly and honestly consider Jordan Pond Co.'s proposal.

147.    Had NPS not violated this contractual obligation, Jordan Pond Co. would have been selected for award.

## Count IX

*(Breach of implied-n-fact contract of fair and honest consideration)*

148.    Jordan Pond repeats and re-alleges the allegations in paragraphs 1-147 as if set forth fully herein.

149.    Based on its improper evaluation and violation of the confidentiality of the evaluation process, NPS has violated its implied contract to fairly and honestly consider Jordan Pond Co.'s proposal.

150.    Had NPS not violated this contractual obligation and properly evaluated the proposals, Jordan Pond Co. would have been selected for award.

## PRAYER FOR RELIEF

WHEREFORE, Jordan Pond Company, LLC respectfully requests that this Court:

(a)    find that NPS's evaluation of the proposals submitted in response to the solicitation was contrary to law, arbitrary, capricious, an abuse of discretion and was therefore invalid and must be set aside;

(b)    find that NPS's decision to select Dawnland, LLC for award of the contract was contrary to law, arbitrary, capricious, an abuse of discretion and was therefore invalid and must be set aside;

(c)     find that Jordan Pond Company, LLC succeeds on the merits, will suffer irreparable harm if an injunction is not issued, and that the harm to Jordan Pond if an injunction is not issued outweighs the harm to the Government if an injunction is granted, and an injunction is in the public interest;

(d)     issue an injunction prohibiting NPS from awarding the contract to Dawnland, LLC;

(e)     issue an injunction directing NPS to award the concession contract to Jordan Pond Company, LLC, or in the alternative, direct NPS to reevaluate the proposals in accordance with applicable regulations and its obligation to consider all proposals fairly and consistently;

(f)     issue relief remanding the matter to the National Park Service with directions to properly evaluate the proposals;

(g)     find that NPS violated its contractual obligations to fairly and honestly consider Jordan Pond Company LLC's proposal;

(h)     grant Jordan Pond Company, LLC its costs and attorneys' fees incurred in pursuing this action as well as its proposal preparation costs; and

(i)     grant Jordan Pond Company, LLC such further relief as this Court deems just and proper.

Respectfully submitted,

Kevin R. Garden
The Garden Law Firm, P.C.
901 N. Pitt Street
Suite 325
Alexandria, VA 22314

kevin@gardenlawfirm.com
Tel.:  (703) 535-5565
Fac.: (703) 997-1330

Counsel for Plaintiff
Jordan Pond House LLC

Dated:  November 20, 2013