# In the United States Court of Federal Claims

No. 13-913 C

(Filed April 8, 2014)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | * | |
| JORDAN POND COMPANY, LLC, | * | |
| | * | |
| *Plaintiff*, | * | |
| | * | Bid Protest; Concession |
| v. | * | Contract; 28 U.S.C. § 1491(a) |
| | * | (2012); Whether the Terms of |
| THE UNITED STATES, | * | a Draft Contract Invalidate the |
| | * | Agency's Evaluation of the |
| *Defendant*, | * | Awardee's Proposal. |
| | * | |
| DAWNLAND, LLC, | * | |
| | * | |
| *Intervenor-Defendant*. | * | |
| * * * * * * * * * * * * * * * * | * | |

*Kevin R. Garden*, Alexandria, VA, for plaintiff.

*Barbara E. Thomas*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Bryant G. Snee*, Acting Director, *Reginald T. Blades, Jr.*, Assistant Director, Washington, DC, for defendant. *Melissa Lackey*, U.S. Department of the Interior Office of the Solicitor, Washington, DC, of counsel.

*Neil H. O'Donnell*, San Francisco, CA, for intervenor-defendant. *Jeffery M. Chiow* and *Lauren B. Kramer*, San Francisco, CA, of counsel.

---

[1]/ This opinion was issued under seal on March 14, 2014. Pursuant to ¶ 4 of the ordering language, the parties were invited to identify proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. Proposed redactions were filed on April 19, 2014 and were acceptable to the court. Brackets ([ ]) identify the redacted portions of this opinion.

_____

## OPINION AND ORDER

_____

**Bush**, *Senior Judge*.

Now pending before the court are the parties' cross-motions for judgment on the administrative record.  Plaintiff Jordan Pond Company, LLC (Jordan Pond) filed a pre-award bid protest complaint on November 20, 2013.  In this protest, Jordan Pond challenges a proposed contract award by the National Park Service of the United States Department of the Interior (Park Service or NPS) to Dawnland, LLC (Dawnland).  At issue is a ten-year concession contract to provide various concession services at Acadia National Park (Acadia) on the Maine coast. Dawnland has intervened in this suit.

The administrative record (AR) was filed on December 9, 2013, amended on January 8, 2014 and supplemented on January 14, 2014.  Briefing was filed according to an expedited schedule and oral argument was held on February 18, 2014.  As discussed below, the proposed award decision was neither arbitrary nor capricious; furthermore, the record does not show that the Park Service abused its discretion in crafting a proposed contract with Dawnland.  Accordingly, plaintiff's motion for judgment on the administrative record is denied, and defendant's and intervenor-defendant's motions for judgment on the administrative record are granted.

## BACKGROUND

### I.    Issuance of the Prospectus

The visitor services at Acadia at issue in this competition include a restaurant and shop at Jordan Pond House, a shop on Cadillac Mountain and

another shop at Thunder Hole.  Jordan Pond has been the concessioner at Acadia since 1932.[2]  AR at 1201.  Jordan Pond's last ten-year concession contract at Acadia was due to expire December 31, 2012.  *Id.* at 1.  On July 19, 2012, the Park Service issued a prospectus seeking offers for the next ten-year contract at Acadia. *Id.* Tab 3.  The prospectus also contained a template concession contract for Acadia (hereinafter, Baseline Contract) for the consideration of offerors.  *Id.* at 151-246. Jordan Pond's incumbent contract was eventually extended through 2013.  *Id.* at 109.

## II.    Evaluation Factors and Scoring Scheme

The prospectus adopts the standard selection factors set forth in 36 C.F.R. § 51.17 and the standard scoring scheme for these factors set forth in 36 C.F.R. § 51.16.[3]  AR at 125-26.  The selection factors and scoring scheme are set forth in this manner in the prospectus:

> For each selection factor, the Service will assign a score that reflects the determined merits of the proposal under the applicable selection factor and in comparison to the other proposals received, if any.  The Service will give equal weight to each subfactor under a given selection factor unless otherwise expressly stated.
>
> **Principal Selection Factor 1** (scored from zero to five). The responsiveness of the proposal to the objectives, as described in the Prospectus, of **protecting, conserving, and preserving resources of the park area**;
>
> **Principal Selection Factor 2** (scored from zero to five). The responsiveness of the proposal to the objectives, as described in the Prospectus, of **providing necessary and appropriate visitor services at reasonable rates**;

---

[2]/  The court refers to both Jordan Pond Company, LLC and its parent corporation as "Jordan Pond" in this opinion.

[3]/  All references to the Code of Federal Regulations are to the current version, which is identical in relevant part to the version in force at the time the prospectus was issued.

**Principal Selection Factor 3** (scored from zero to five). The experience and related background of the Offeror, including the **past performance and expertise of the Offeror in providing the same or similar visitor services** as those to be provided under the new concession contract;

**Principal Selection Factor 4** (scored from zero to five). The **financial capability of the Offeror** to carry out its proposal;

**Principal Selection Factor 5** (scored from zero to four, with a score of one for agreeing to the minimum franchise fee contained in the prospectus).  The **amount of the proposed minimum franchise fee**, if any, and/or other forms of financial consideration to the Service. Consideration of revenue to the United States will be subordinate to the objectives of protecting, conserving, and preserving resources of the park area and of providing necessary and appropriate visitor services to the public at reasonable rates;

**Secondary Selection Factor 1** (scored from zero to three).  The quality of the Offeror's proposal to conduct its operations in a manner that furthers the protection, conservation, and preservation of the park area and other resources through **environmental management programs** and activities, including, without limitation, energy conservation, waste reduction, and recycling;

**Secondary Selection Factor 2** (scored from zero to two). Providing **suitable living environments for concessioner personnel**.

The Service then will assign a cumulative point score to each proposal based on the assigned score for each selection factor.  The Service will select the responsive

proposal with the highest cumulative point score as the
best proposal.

*Id.* (reformatted and condensed, with emphasis added).  Although some variation is
possible, the mid-point of a point scale for a factor might be considered to be an
"adequate" score for that particular factor.  *See id.* at 1636.  Based on this scoring
scheme, the highest possible cumulative score for a proposal would be twenty-nine
points.

Within the evaluation factors were various subfactors, which, as noted
above, were equally important within that selection factor.  The following
summary provides an outline of factors and subfactors to be considered in the
evaluation of proposals:

Principal Selection Factor 1 (**protecting, conserving,
and preserving resources of the park area**) --
Subfactor 1(a):  **Resource Education for Visitors and
Employees**
Subfactor 1(b):  **Vehicle Management**

Principal Selection Factor 2 (**providing necessary and
appropriate visitor services at reasonable rates**) --
Subfactor 2(a):  **Retail Operations**
Subfactor 2(b):  **Healthy and Sustainable Food**
Subfactor 2(c):  **Tribal Relationships**

Principal Selection Factor 3 (**past performance and
expertise of the Offeror in providing the same or
similar visitor services**) --
Subfactor 3(a):  **Iconic Food Service Dining Experience**
Subfactor 3(b):  **Violations or Infractions**

Principal Selection Factor 4 (**financial capability of the
Offeror**) --
Subfactor 4(a):   **Credible, proven track record of
meeting financial obligations**

5

Subfactor 4(b):  **Financially viable proposal and understanding of the financial obligations of the [Baseline] Contract**
Subfactor 4(c):  **Ability to obtain the required funds for start-up costs under the [Baseline] Contract and explanation of the financial arrangements proposed**

Principal Selection Factor 5 (**amount of the proposed minimum franchise fee**) --
No Subfactors

Secondary Selection Factor 1 (**environmental management programs**) --
Subfactor 1(a):  **Sustainable Practices**
Subfactor 1(b):  **Local, Regional and Other Sustainable Food Sources**

Secondary Selection Factor 2 (**suitable living environments for concessioner personnel**) --
No Subfactors

*See* AR at 135-50 (reformatted and summarized, with emphasis added).  The prospectus also identifies, within the description of the selection factors and subfactors, the objectives of the Park Service in these areas.  *Id.*

## III.    Proposals Received

[ ] proposals were received by the due date of November 20, 2012, but only [ ] proposals scored high enough in the evaluation process to be relevant to this bid protest.[4]  Jordan Pond identified itself as "a local organization with many years of experience."  AR at 1201.  Dawnland identified itself as "[ ]."  *Id.* at 830.  [ ] noted its "[ ]."  *Id.* at 1924.

## IV.    Evaluation of Proposals

---

[4]/ Consequently, in this opinion the court's shorthand reference to "all" of the proposals will be to the [ ] leading proposals.

An evaluation team (evaluation panel or panel) was assembled by the Park Service and met in Philadelphia from December 3 through December 7, 2012.  AR at 1721.  The report of the evaluation panel was finalized on December 28, 2012, and was approved by NPS regional and national directors on May 9, 2013 and July 12, 2013.  *Id.* Tabs 10-12.  Offerors were notified of the award decision on September 28, 2013.  *Id.* Tabs 13-16.  Dawnland's proposal was selected for award, with [ ] points; [ ]'s proposal was second, with [ ] points; and Jordan Pond's proposal was third, with [ ] points.  *Id.* at 1721.

## V.    Procedural History

Jordan Pond challenges the proposed concession contract award to Dawnland in this bid protest.  The complaint was amended by leave of the court on January 9, 2014.  One of the principal contentions in the amended complaint is that the draft proposed contract with Dawnland (hereinafter, Draft Contract) omits many elements of Dawnland's proposal "upon which its [winning] scoring was based."[5]  Am. Compl. ¶ 61.  The complaint also alleges that numerous evaluation errors invalidate the Park Service's award decision.  The court reserves further discussion of plaintiff's arguments for the analysis section of this opinion.

## DISCUSSION

## I.    Jurisdiction

Jurisdiction over this concession contract bid protest is provided by 28 U.S.C. § 1491(a) (2012).  *Eco Tour Adventures, Inc. v. United States*, 114 Fed. Cl. 6, 18-21 (2013).  As this court held in *Eco Tour*, concession contracts are not procurements so as to permit concession contract pre-award or post-award protests under this court's 28 U.S.C. § 1491(b) (2012) jurisdiction.  *See id.* at 20.  For the jurisdictional analysis in *Eco Tour*, the court relied on numerous decisions, including:  *Resource Conservation Group, LLC v. United States*, 597 F.3d 1238, 1242, 1244-47 (Fed. Cir. 2010); *Terry v. United States*, 98 Fed. Cl. 736, 737

---

[5]/  The court notes that the Baseline Contract included in the prospectus, AR at 151-246, was prepared by the Park Service and released to the public on July 19, 2012.  The Draft Contract, *id.* Tab 17, on the other hand, was prepared sometime after the Park Service made its selection decision and incorporates some commitments from Dawnland's proposal into the contracting framework set forth in the Baseline Contract.

(2011); *Frazier v. United States*, 67 Fed. Cl. 56, 59 (2005), *aff'd*, 186 F. App'x 990 (Fed. Cir. 2006); and, *YRT Services Corp. v. United States*, 28 Fed. Cl. 366, 392 n.23 (1993).

Further, this court in *Eco Tour* held that injunctive and declaratory relief in a concession contract protest are not available under 28 U.S.C. § 1491(a). 114 Fed. Cl. at 40-42. Thus, although this protest falls within the ambit of the court's jurisdictional grant in § 1491(a)(1) under the theory of a breach of an implied contract between the government and prospective bidders to treat bidders' proposals fairly and honestly, Am. Compl. ¶¶ 173-175, Jordan Pond's potential recovery in this suit is limited to bid preparation and proposal costs. *Eco Tour*, 114 Fed. Cl. at 21, 42. The court relies on the extensive analysis of these issues in *Eco Tour*, which, as regards jurisdiction, dealt with a concession contract indistinguishable from the concession contract at issue here. The court concludes that jurisdiction for this suit lies exclusively under § 1491(a)(1), and that plaintiff's recovery, if any, would be limited to bid preparation and proposal costs.

Plaintiff's arguments to the contrary have no merit. Although plaintiff attempts to distinguish the concession contract in *Eco Tour* from the concession contract at issue here, both contracts are concession contracts which provide funding to the Park Service, not procurement contracts. Plaintiff also attempts to rely on the persuasiveness of jurisdictional analyses of the Government Accountability Office and the Interior Board of Contract Appeals as to the nature of concession contracts, Pl.'s Mot. at 49, but these analyses were specifically rejected in *Eco Tour* and must again be rejected here.

In any event, to the extent that plaintiff argues that the concession contract in Acadia National Park is a "mixed transaction" encompassing both a procurement of services for the government as well as a concession contract which provides funding to the Park Service, the court disagrees. As both defendant and intervenor-defendant note, maintenance of the concession buildings in Acadia is better characterized as a condition of the opportunity to operate the concession rather than as separate services provided to the Park Service. *See* Def.'s Reply at 20 (describing maintenance responsibilities of the Acadia concessioner as "incidental"); Dawnland's Reply at 21 (describing maintenance responsibilities as "one of the elements of this concession contract [which] relate to the granting to Dawnland of the right, for a fee, to provide visitor services"). Even under the

"mixed bag" transaction theory proposed by plaintiff, Pl.'s Reply at 46, the Acadia concession contract could not be classified as a procurement.

Finally, plaintiff attempts to find support in a 1978 Court of Claims case for its proposition that "the 'mixed bag' solicitation at issue [here] constitutes a procurement for purposes of 28 U.S.C. § 1491(b)." Pl.'s Reply at 46; *see also id.* at 48-49. Plaintiff relies on *Yosemite Park & Curry Co. v. United States*, 582 F.2d 552, 554 (Ct. Cl. 1978), but plaintiff's reliance on *Yosemite Park* is misplaced, for several reasons. First, it is difficult to conceive how *Yosemite Park* provides any precedential insight into the scope of this court's § 1491(b) bid protest jurisdiction, or the distinction between § 1491(a) and § 1491(b) bid protest jurisdiction in this court, in light of the fact that *Yosemite Park* predates the enactment of § 1491(b) by almost twenty years. Second, there is no clear statement in *Yosemite Park* regarding the key issue of whether a concession contract can also be a procurement contract so as to permit this court to award injunctive or declaratory relief under § 1491(b) or any other authority. Third, as defendant and intervenor-defendant note, *Yosemite Park* involved an unusual fact pattern where a Memorandum of Understanding was grafted onto a concession contract – the facts of *Yosemite Park* and the concession contract in this case are readily distinguishable. *See YRT Services*, 28 Fed. Cl. at 392 n.23 (also distinguishing *Yosemite Park* due to its particular facts). For all of these reasons, plaintiff has failed to rebut the jurisdictional analysis presented in *Eco Tour* and adopted here.

## II.    Standards of Review

### A.    Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. To review a motion or cross-motions under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

### B.    Bid Protest Review

The court first inquires into the plaintiff's standing to bring the bid protest. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). Bid protest standing is limited to those plaintiffs who are actual or prospective bidders and whose direct economic interest would be affected by the award of the contract or by the failure to award the contract. *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citation omitted). In the circumstances of a pre-award protest where, as here, an award decision has been made but not finalized, a protester possessing a substantial chance of winning the disputed contract has a direct economic interest and has standing before this court. *Id.* at 1348-49.

Upon determining that a plaintiff has standing to sue, the court next considers the merits of the bid protest. A bid protest proceeds in two steps, with the trial court first determining whether the government acted without a rational basis or contrary to law. *Bannum*, 404 F.3d at 1351. If the award decision fails review, the court then determines as a factual matter whether the plaintiff was prejudiced by the arbitrary or unlawful conduct. *Id.*

The standard of review for the typical bid protest brought pursuant to section 1491(b) is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law (the APA standard). 28 U.S.C. § 1491(b)(4) (incorporating the APA standard set forth in 5 U.S.C. § 706 (2012)); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)). Under the APA standard, a procurement decision may be set aside if it lacks a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute or regulation. *Banknote*, 365 F.3d at 1351; *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)).

The APA standard applicable to agency actions challenged in a bid protest is "highly deferential." *Advanced Data Concepts*, 216 F.3d at 1058. Under this standard, *de minimis* errors in the procurement process do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)).

A bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)). Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (*Alabama Aircraft*) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alteration in original). The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted).

The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation. "[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (citations omitted); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals.") (citation omitted). "[W]here an agency's decisions are highly technical in nature, . . . judicial restraint is appropriate and proper." *Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) (citing *Isometrics v. United States*, 5 Cl. Ct. 420, 423 (1984)).

Similar principles apply to bid protests of concession contract award decisions. *Eco Tour*, 114 Fed. Cl. at 22-23. To recover under the implied contract for bids to be fairly and honestly considered in a protest brought pursuant to section 1491(a), a plaintiff must establish that the agency acted arbitrarily or capriciously, or abused its discretion. *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998) (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203 (Ct. Cl. 1974)); *Distributed Solutions, Inc. v. United States*, 106 Fed. Cl. 1, 25 (2012) (citations omitted), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013); *FAS Support Servs., LLC v. United States*, 93 Fed. Cl. 687, 694 (2010) (citation omitted). The standard of review for a bid protest alleging a breach of the implied contract under section 1491(a) is, therefore, "essentially the same" as the APA

standard applicable to protests pursued under section 1491(b).  *FAS Support*, 93
Fed. Cl. at 694.

"'If the court finds a reasonable basis for the agency's action, the court
should stay its hand even though it might, as an original proposition, have reached
a different conclusion as to the proper administration and application of the
procurement regulations.'"  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648
(Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301
(D.C. Cir. 1971)).  If, on the other hand, the protester has shown a significant error
in the procurement process, the court must determine as a factual matter whether
that error prejudiced the protester, because both error and prejudice are required for
the protester to prevail.  *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.
Cir. 1996) (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir.
1996)).

A bid protest plaintiff bears the burden of establishing prejudice.  *Bannum*,
404 F.3d at 1358.  To meets its burden, a protester must show that there was a
substantial chance it would have received the contract but for the agency's alleged
error.  *Id.* (citations omitted); *Alfa Laval Separation, Inc. v. United States*, 175 F.3d
1365, 1367 (Fed. Cir. 1999); *Data General*, 78 F.3d at 1562.  This "substantial
chance" inquiry is the same as that applied to determine a protester's standing.
Thus, in this bid protest, the substantial chance standard must be applied twice:
first, to determine Jordan Pond's standing to bring its suit; and, second, to
determine whether Jordan Pond suffered prejudice as a result of any adjudged
errors in the procurement process.  *See, e.g.*, *Linc Gov't Servs., LLC v. United
States*, 96 Fed. Cl. 672, 695-96 (2010) (differentiating between "allegational
prejudice" and "APA prejudice," both of which apply the substantial chance test).

## III.   Standing

Although the government and Dawnland have not directly challenged Jordan
Pond's standing to bring this protest of the Park Service's proposed award of the
concession contract to Dawnland, the government does contest plaintiff's standing
"to challenge the terms upon which the agency chooses to contract with
Dawnland."  Def.'s Reply at 1.  This standing argument, although superficially
attractive, is ultimately not persuasive.  The government's argument, largely
unsupported by case citations, depends on the complete separation of Jordan

Pond's protest of evaluation rankings from Jordan Pond's arguments regarding the contents of a draft proposed contract with Dawnland.  *Id.* at 4 ("Because the agency's drafting of the Dawnland contract was a separate action from its selection of Dawnland, Jordan Pond cannot challenge the rationality of that drafting without first showing how it was injured by the [contents] of the [proposed] contract.").

Defendant states that "the incorporation of elements from Daw[n]land's proposal into the draft concession contract was not part of the selection process, as both applicable law and the administrative record make clear."  Def.'s Reply at 3. The government also contends that "[t]he selection of Dawnland was thus complete before the agency decided which elements of Dawnland's proposal to incorporate into the draft concession contract."  *Id.*  The government reasons that

> because the revision of the draft contract was not part of
> the process by which Dawnland was selected as the
> offeror of the best proposal, that selection [for award]
> was not and could not be affected by the agency's
> determinations regarding which elements of Dawnland's
> proposal should be included in the concession contract.
> If the agency had included in the contract every element
> of Dawnland's proposal, or if it had included none,
> Dawnland would still have been the selected offeror.  The
> agency's decisions regarding which proposal elements to
> incorporate into the contract thus had no effect on Jordan
> Pond and are not relevant to this protest.

*Id.*  The government concludes that "Jordan Pond therefore lacks standing to challenge the validity of the agency's choice of contract terms, and to the extent this protest is founded upon that challenge, it must be dismissed for lack of subject-matter jurisdiction."  *Id.* at 4 (citation omitted).

The court, however, distinguishes between the *relevance* of Jordan Pond's reliance on the Draft Contract with Dawnland and plaintiff's *standing* to bring this suit.  Simply because many of plaintiff's arguments may turn out to be irrelevant or unpersuasive does not indicate that Jordan Pond lacks standing to bring this bid protest.  The protestor need not prove standing for every argument, or for every facet of every argument, for this court to reach the merits of a bid protest.  *See, e.g.,*

13

*L-3 Commc'ns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 665 (2009) (declining to require a protestor to "show that it has standing for each and every argument it has raised in requesting relief from this court").  Whether or not the terms of the Draft Contract have any relevance to the outcome of this case goes more to the merits of this protest than to standing.  *See id.* (stating that "[w]hether [the plaintiff] will prevail on the merits of its [particular] argument is not a question of standing").

Here, plaintiff contends that the agency's award decision is irrational in light of the terms of the Draft Contract, and is irrational for many other reasons as well.  As stated *supra*, bid protest standing is limited to those plaintiffs with a substantial chance of winning the contract at issue in the protest.  *Orion*, 704 F.3d at 1348-49.  If the scoring of the proposals received from Dawnland, [ ] and Jordan Pond was indeed arbitrary and capricious, as plaintiff contends, there is a substantial chance that Jordan Pond would have been awarded the concession contract.  Accordingly, the court concludes that Jordan Pond has standing to bring this bid protest.

## IV.   Analysis

Plaintiff presents two principal lines of argument.  First, plaintiff suggests that the Park Service's award decision is irrational because the Draft Contract fails to incorporate many of the innovations in Dawnland's proposal that were praised by the evaluation panel and which contributed to Dawnland's winning score.  Pl.'s Mot. at 2.  Second, plaintiff argues that the scoring of proposals was sufficiently flawed to render the award decision arbitrary and capricious.  *Id.* at 3.  Both of these overarching arguments are without merit.

Before turning to the parties' arguments on the merits, however, the court must address a threshold issue concerning materials presented by the parties for the court's consideration.  The court has examined the administrative record prepared by the agency and finds it to present a clear and complete picture of the agency's award decision.  The court has considered the parties' arguments which are based upon this record and which contain page citations to the record.  The court has not considered, however, explanatory charts attached to the parties' briefs or provided to the court as demonstrative exhibits at oral argument.  Nothing in the administrative record required explanation of the sort provided in these charts.  For

this reason, the court will not reference any of the parties' explanatory charts in this opinion.[6]

### A.   The Draft Contract Does Not Render the Agency's Award Decision Arbitrary or Capricious, and Does Not Evidence an Abuse of Discretion

As defendant argues, there is a significant distinction between the evaluation of proposals to select the best proposal and the incorporation of terms of the best proposal into a draft contract.  Def.'s Reply at 3.  Plaintiff relies on three cases for its proposition that the Draft Contract is nonetheless relevant to this protest: *Planning Research Corp. v. United States*, 971 F.2d 736, 738-41 (Fed. Cir. 1992); *Jacobs Technology Inc. v. United States*, 100 Fed. Cl. 198, 210 (2011); and *Hunt Building Co. v. United States*, 61 Fed. Cl. 243, 246, *modified*, 63 Fed. Cl. 141 (2004).  Pl.'s Mot. at 47-48; Pl.'s Reply at 18-19; Oral Argument Transcript (Tr.) at 7-8.  The court finds these authorities to be inapposite because the facts in those cases are distinguishable from this case.

*Planning Research* discussed a classic "bait and switch," where an offeror was permitted to later substitute staff members for key personnel positions, despite having included resumes for particular candidates for these key positions in its proposal.  *Jacobs Technology* concerned the later discovery of information about a potential organizational conflict of interest that might have disqualified the winning offeror.  *Hunt Building* discussed the relaxation of material solicitation requirements after a contract award.  None of these fact patterns pertains here.  Further, none of these cases addresses, even tangentially, the question of whether an agency's decision to incorporate some but not all of the elements of a winning

---

[6]/ The court also declines to address the innuendo and disparaging remarks which season plaintiff's briefs.  *See, e.g.*, Pl.'s Mot. at 27 (suggesting that the evaluation panel was "clueless as to the substantive merits of the proposals"), 33 (characterizing the evaluation panel's ratings of the offerors' experience as "highly suspicious"); Pl.'s Reply at 15 n.5 (raising the specter of an "inappropriately informal relationship" between the NPS and Dawnland).  Such commentary was not persuasive as to any alleged infirmity in the agency's award decision.  The court notes that plaintiff has disavowed any attempt to show bad faith on the part of the Park Service.  Pl.'s Reply at 18 (stating that the government's assertion that Jordan Pond assumes bad faith on the part of the NPS is "invalid" and that plaintiff "does not assert NPS acted in bad faith").  In the absence of specific allegations of bad faith, such remarks are gratuitous and irrelevant.

proposal into a draft contract is relevant to the propriety of the agency's selection process. Nor do these cases address the competition for concession contracts with the Park Service, which, as noted *supra*, is different from procurement contract competitions. The court must consider, therefore, whether the logical construct presented by plaintiff requires a comparison of the Draft Contract with Dawnland's proposal.

Plaintiff contends that some elements of the best proposal would logically be included in a draft concession contract. Tr. at 12 (relying on principles of "fairness and logic[] and rationality"), 13 ("That's a totally arbitrary selection method if you're not going to make them do exactly what it was that was the basis for selecting them for award. There's no logic to that."). The court notes, however, that the relevant regulations give the Park Service substantial discretion in this regard. For example, 36 C.F.R. § 51.19 states that

> [e]xcept for incorporating into the concession contract
> *appropriate* elements of the best proposal, the Director
> must not award a concession contract which materially
> amends or does not incorporate the terms and conditions
> of the concession contract as set forth in the prospectus.

*Id.* (emphasis added).

Nothing in the concession contract regulations, the prospectus, or internal guidance documents of the Park Service suggests that all, or even most, of the elements of the best proposal must be included in the Draft Contract. *See* AR at 128 ("The [Park] Service, in accordance with 36 C.F.R. Part 51, *may* include as terms of the draft concession contract, *appropriate* elements of the proposal selected for award of the concession contract, including, without limitation, investments, facilities, services, and other commitments.") (emphasis added), 1634 (stating that "commitments made by each offeror above and beyond the requirements of the [Baseline] Contract . . . *may* be incorporated into the Contract before it is executed") (emphasis added), 1637 ("Anything a winning Offeror proposes *can* be incorporated into the draft contract, regardless of [whether] the element was considered in the scoring or not.") (emphasis added), 1648 ("The park staffer responsible for incorporating the terms of the better offer [into the Baseline Contract] should have a copy of that proposal to begin working on changes to the

16

[Operating Plan] and [Maintenance Plan].").  The court must therefore review plaintiff's challenge to the agency's selection decision, and, in particular, plaintiff's contentions regarding the relevance of the inclusion or exclusion of certain elements of Dawnland's proposal in the Draft Contract, with the agency's discretion in mind.

At oral argument, plaintiff conceded that the Park Service has some discretion in incorporating elements of a winning proposal in a draft contract, but plaintiff insisted that the Draft Contract in this case exhibits illogical reasoning or an abuse of discretion:

> [W]e are not challenging the Park Service['s] mere ability or authority to exercise discretion.  Instead, we are challenging the specific way the Park Service exercised its discretion in this particular evaluation.  We're not asserting that the Park Service must always, in every evaluation, include any particular element from a winning proposal as a contract term.  We're asserting that NPS has abused its discretion in this particular case and acted illogically given that the specific basis it used to make its selection is illogical given what it chose to put in the contract.  So, we're really focusing on the evaluation process, and thus, we think their conduct shows that this was illogical in this particular case.

Tr. at 9.  Having considered the authorities relied upon by plaintiff, its arguments based on logic and rationality, the regulatory framework of concession contracts, the terms of the prospectus, the guidance documents in the record, and the Draft Contract itself, the court must disagree with plaintiff's overarching argument that the Draft Contract renders the award to Dawnland irrational.  Further, although the Draft Contract is not entirely irrelevant to this bid protest, plaintiff attaches far greater significance to the content of the Draft Contract than is warranted.

First, as defendant notes, there is nothing in the record to suggest that when the Park Service omitted a particular feature of Dawnland's proposal in the Draft Contract, such an omission amounted to a rejection of that feature because it was

infeasible or undesirable.[7]  Def.'s Mot. at 28-31.  The record, rationally read, indicates that this type of concession contract does not necessarily incorporate every or even most of the features of the winning proposal.  Instead, certain provisions are merely grafted onto a largely boilerplate contract, which in this case had already been revised in the prospectus to indicate Park Service priorities in Acadia National Park, to include features in the winning proposal that the Park Service chose to implement in the new contract.  To assume otherwise is pure speculation that has no support in the administrative record, and such an assumption, for that matter, is not a logical conclusion.

The court therefore rejects plaintiff's overall thesis that the agency's failure to incorporate certain of Dawnland's high-scoring proposal features into the Draft Contract meant that the agency, by definition, had subsequently deemed those features to be undesirable.  *Cf.* Pl.'s Mot. at 13 ("[T]he evidence which is in the record demonstrates that a vast number [of] Dawnland's performance commitments which were highlighted by the Panel were rejected by NPS because they were (1) infeasible and thus should have been the basis of a lower score, (2) of no value whatsoever to the Government and thus not supporting Dawnland's higher score, or (3) non-enforceable and thus totally illusory and meaningless.").  Such a leap of logic fails in the context of the regulatory framework and the terms of the prospectus which contained no prohibition against defendant's ability to select the proposal features it wished to include in the Draft Contract.

It follows, therefore, that the agency was under no obligation to review the content of the Draft Contract to ensure that its evaluation of proposals guaranteed the inclusion of all or most of Dawnland's proposal features in the Draft Contract.  *Cf.* Pl.'s Mot. at 2 ("NPS should have gone back and reevaluated the proposals [but] . . . NPS inexplicably did not reevaluate the proposals and apparently intends to proceed with awarding the contract to Dawnland.").  Indeed, there is no

---

[7]/  Additions of highly-specific contract requirements, such as those chosen from among the many commitments in Dawnland's proposal, are edited into the Operating Plan and Maintenance Plan sections of the Baseline Contract.  AR at 1648.  As evidenced by the Draft Contract here, these highly-specific commitments constitute a small portion of the contract terms that will bind the parties.  *See* AR at 1845-66, 1902-06 ("Additional initiatives"), 1919 ("Concessioner Improvements").  Highly-specific features of the Operating Plan and the Maintenance Plan of the incumbent concession contract also constituted but a small portion of the terms binding the Park Service and Jordan Pond.  *See* AR at 43-58, 79-89.

indication that the award decision procedures outlined in the prospectus or in the Park Service's internal guidance documents contemplated such a feedback loop. *See* AR at 126, 1629-49. The "enhanced" selection procedure that plaintiff advances here, which requires a comparison of the Draft Contract with Dawnland's proposal, contradicts the selection procedure set forth in 36 C.F.R. Part 51 and the prospectus. *See* 36 C.F.R. §§ 51.16-51.17; AR at 125-26. The court cannot fault the agency for an alleged failure to re-evaluate proposals when such a re-evaluation process is in direct conflict with applicable regulations and the prospectus.[8]

The court acknowledges that there might be, hypothetically, a draft concession contract which, by its failure to include significant elements from the winning proposal, evinces an arbitrary and capricious selection process conducted by the Park Service. The court need not decide that issue in this case. The Draft Contract in the record here, which has already been executed by Dawnland, contains significant elements of Dawnland's proposal and is, in the court's view, entirely consistent with the winning score awarded Dawnland's proposal. Most of these proposal elements are included in the Operating Plan and the Maintenance Plan in the Draft Contract, *see* AR at 1845-66, 1902-06, 1919, and the Draft Contract, despite plaintiff's numerous protestations to the contrary, does not render the agency's award decision illusory, arbitrary or capricious. Nor did the Park Service abuse its discretion in adopting certain elements of Dawnland's proposal and not others.

## B.    The Evaluation of Proposals Was Not Significantly Flawed

Plaintiff correctly identifies two errors in the evaluation report but has not shown that these minor errors invalidated the ratings awarded by the evaluation panel to the proposals of Dawnland, [ ] and Jordan Pond, or that these two errors were prejudicial to Jordan Pond. In addition, although plaintiff argues strenuously to convince the court that the evaluation panel did not correctly rate the proposals in many of the selection factors and subfactors, the court must agree with

---

[8]/ Intervenor-defendant suggests that plaintiff's contentions regarding the inclusion of the winning proposal's terms in the Draft Contract is barred by *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1313-14 (Fed. Cir. 2007), because plaintiff's challenge to the terms of the prospectus is untimely. Dawnland's Mot. at 14 n.5. Plaintiff disagrees. *See* Tr. at 8-10. Because plaintiff's arguments regarding the Draft Contract have no merit, the court need not decide whether these arguments are barred by the doctrine invoked by intervenor-defendant.

defendant that these arguments are largely plaintiff's "subjective disagreement with the judgment of the agency." Def.'s Mot. at 23.  Finally, plaintiff finds fault with the composition of the evaluation panel, but the court in that regard has discerned in the record only a *de minimis* failure to follow a procedure outlined in a non-binding internal guidance document.  For these reasons, the court must rule against plaintiff on the merits of its protest.  The court addresses plaintiff's principal contentions regarding flaws in the evaluation process by addressing these topics:  minor non-prejudicial evaluation errors, valid evaluation results, and valid evaluation panel composition.[9]

### 1.    Minor Evaluation Errors of No Prejudicial Impact:  [ ] and Native Sturgeon Roe

The incumbent concession contract required that [ ] be served at Jordan Pond House, AR at 45, and a copy of the incumbent contract (including the [ ] provision) was appended to the prospectus, *id.* at 292.  The Baseline Contract in the prospectus omitted the [ ] requirement, however, a fact that was lamented by Jordan Pond in its proposal.[10]  *Id.* at 1399 (stating that [ ]).  Jordan Pond's proposal

---

[9]/  The court has considered all of Jordan Pond's arguments presented in the body of plaintiff's briefs and at oral argument.  To the extent that some of plaintiff's arguments are not mentioned here in the interests of judicial economy, the court has found those arguments to be unpersuasive.

[10]/  The court notes that one of the distinguishing features of the proposals submitted by Dawnland and Jordan Pond is that these proposals varied in the tone of their discussion of tradition at Jordan Pond House.  Dawnland describes its experience in "taking on under-performing concessions [and] turning them around," AR at 830, and describes its restaurant offerings as "respecting Jordan Pond House . . . traditions like popovers, homemade ice cream, and tea service but also paying homage to traditional foods eaten by the Wabanaki, native tribes that predated European settlement," *id.* at 892.  Jordan Pond, however, emphasizes tradition by stating that "we feel uniquely qualified to provide park visitors with the traditional Jordan Pond House experience," *id.* at 1201, and devoting extensive sections of its proposal to topics such as "Keeping the Tradition in Jordan Pond House," *id.* at 1387, "Preserving the Unique History of Jordan Pond House," *id.* at 1398, "Ensuring Traditional 'Tea House' Service of the 1930s," *id.*, and "Plan for Changes to Keep the Tradition Fresh," *id.* at 1401.  Dawnland's proposal appears to present a more aggressive approach to change, *id.* at 1002 (stating that "we think that the current operation can be improved significantly"), whereas Jordan Pond's proposal touts the incumbent's proven ability to "maintain a very tight grip on ensuring the quality of the 'iconic'

(continued...)

also noted that [ ] are not grown locally (Maine) or regionally (New England), and that the incumbent's operation used "over 61,000 [ ] annually."  *Id.* at 1573.

All three offerors proposed to serve [ ] at Jordan Pond House.  Secondary Selection Factor Subfactor 1(b) (SSF1(b)) measured the offerors' plans regarding "Local, Regional, and Other Sustainable Food Sources."  AR at 149.  This selection subfactor states in relevant part that:

> Identify your baseline percentage of purchases to meet the local and regional food sourcing standards outlined in the Operating Plan . . . and identify how you will increase the percentage of purchases over the term of the contract. Include the targets you seek to achieve by the end of the contract and the methods you will use to accomplish those targets.  Identify how you will monitor progress on these purchases on an annual basis in order to demonstrate progress.  You may supplement the table with narrative descriptions.
>
> If local or regional food sources are not available for certain food items either during part or all of the operating season, explain what other food items you will feature to support a comprehensive program of providing sustainable food choices to visitors.

*Id.*  It is undisputed that Dawnland's proposal stated that [ ] of its produce would be sourced locally or regionally, which means, according to the terms in the prospectus, that [ ] produce for Dawnland's menu items would be grown in Maine or New England.[11]  *Id.* at 191-92, 1181.

---

[10](...continued)
foods and the 'traditional' experiences that continue to be the highlight of every visitor who comes to the Jordan Pond House Restaurant," *id.* at 1398.

[11]/  Although Dawnland labels its table of baseline percentages of purchases and later-year percentages of purchases as "Goals," the prospectus did not request goals for year one but actual baseline percentages of purchases.  *Compare* AR at 149, *with id.* at 1181.  Thus, the Park

(continued...)

21

Plaintiff has presented conjecture that Dawnland misrepresented its sourcing of [ ] to the Park Service.  The court finds no evidence in the record as to Dawnland's subjective intent.  The record does show, however, an inconsistency between Dawnland's proposed menu, which includes [ ], and its ambitious produce sourcing plan, which depends [ ] on New England products.  The evaluation team did not note this inconsistency.  *See* AR at 1791 (noting, without commentary, Dawnland's [ ] baseline percentage for local and regional produce sourcing).  The court agrees with plaintiff that the evaluation panel erred when it failed to note the inconsistency between Dawnland's sourcing plan and its menu.

The court must agree with defendant and intervenor-defendant, however, that this evaluation error was not prejudicial.  Even if the obvious mistake regarding [ ] had been taken into account, the Park Service would have rationally preferred Dawnland's sourcing plan to Jordan Pond's plan.  Dawnland's targets were [ ] and the methods outlined in Dawnland's proposal for meeting those targets were [ ].  AR at 1794-95.  Had the Park Service re-aligned the evaluation in light of the mistake regarding [ ], one aspect of SSF1(b) would have been downgraded for Dawnland, but the other aspects would have been superior to Jordan Pond's proposal under this subfactor.

Even taking the most negative view of Dawnland's mistake regarding the sourcing of [ ], logically the Park Service would have dropped Dawnland's score on SSF1(b) from [ ] to [ ], which was also the rating for Jordan Pond's less-ambitious sourcing plan.  The record shows that Dawnland had earned a [ ] rating for SSF1(a).  AR at 1795.  Under the rating scheme used for SSF1, a [ ] rating on one subfactor, and a [ ] rating on the other, produces a score of [ ].  *Id.*  Dawnland's score from the evaluation panel on SSF1 was [ ].  Thus, at most, Dawnland's overall score, which was [ ] points higher than Jordan Pond's, would fall to [ ] points higher than Jordan Pond's overall score.  There is no possible prejudice to Jordan Pond from a maximum [ ] reduction due to the [ ] on Dawnland's menu and its food sourcing plan.

---

[11](...continued)

Service evaluated Dawnland's commitment to sourcing [ ] of its produce locally and regionally, not an aspirational commitment to try to achieve [ ] local and regional sourcing of produce.  AR at 1791, 1794.

There was another inconsistency between Dawnland's menu and Dawnland's sourcing plan, although this inconsistency was not readily apparent. One of the appetizers on Dawnland's menu, "[ ]," includes an ingredient of "native sturgeon roe." AR at 892. There appears to be no dispute that seafood used in menu items must be local or regional, *id.* at 192, and that "native sturgeon roe" cannot be sourced from New England. Dawnland asserted that all of its seafood would be sourced from New England. *Id.* at 1181 & n.2. This error in Dawnland's seafood sourcing plan was not noted by the evaluation panel.

The court considers the oversight of the evaluation panel regarding the sourcing of "native sturgeon roe" in Dawnland's proposal to be an evaluation error, but one that has no prejudicial effect on Jordan Pond. This second and much less significant sourcing error in Dawnland's proposal would have no additional impact on the rating of proposals once the [ ] issue had been noted by the panel. The [ ] and native sturgeon roe mistakes, together, in other words, carry no more weight than the sourcing error regarding [ ], when considering flaws in the ambitious local and regional food sourcing plan presented by Dawnland. For the reasons stated above, even when these flaws are considered, Dawnland's rating on this factor would still be superior to Jordan Pond's rating on SSF1(b). Furthermore, even when these two evaluation errors are corrected, the maximum negative impact on Dawnland's overall score would still be a deduction of [ ]. The court finds that Jordan Pond suffered no competitive prejudice from the errors in the panel's scoring of SSF1(b).

Plaintiff speculates that had the [ ] and native sturgeon roe mistakes been recognized by the panel, the reliability of Dawnland's sourcing plans would have been questioned and its rating on SSF1(b) would have been drastically downgraded. The court disagrees. The record shows, consistent with the panel's determination, that Dawnland's local and regional sourcing plans are thorough, creative, detailed and, despite these two minor errors, rational overall. *See* AR at 1181-85. In contrast, Jordan Pond's local and regional sourcing plan is dominated by charts of food items, with almost no attention paid to detailed methods for improvement or measurement of progress meeting targets. *Id.* at 1573-77. On this record, the evaluation panel's rating of Dawnland on SSF1(b), AR at 1794-95, which reviewed baseline sourcing, target sourcing, methods and measurement, would have dropped very little, if at all, because of erroneous sourcing plans for [ ] and native sturgeon roe.

23

### 2.      Evaluation Scores Supported by the Record

### a.      Grab and Go Location

Jordan Pond House is described in the prospectus as having a restaurant in one area and a retail operation in another area. AR at 101, 111. The Operating Plan requires that a food service called "grab and go" be offered "within the Jordan Pond House retail area." *Id.* at 111, 191. More grab and go food options were to be provided under the Baseline Contract than were required in the incumbent concession contract. *Id.* at 111, 190-91.

Under Principal Selection Factor Subfactor 2(a) (PSF2(a)), titled "Retail Operations," proposals were rated on "[w]here and how you will offer the grab and go food items at a reasonable range of price points at Jordon Pond House." *Id.* at 137. The court references this particular facet of retail operations as the "grab and go location." This aspect of retail operations was one of four considered by the evaluation panel, and was the only aspect of the evaluation of retail operations that was specific to Jordan Pond House, as opposed to applying generally to all three retail locations of the concessioner (Jordan Pond House, Thunder Hole and Cadillac Mountain).

Plaintiff alleges that Dawnland's ratings in PSF2, and indeed, many of its other evaluation ratings, were incorrectly inflated by a [ ] that was not permitted by the prospectus.[12]  Plaintiff's basic theory of evaluation error rests on a number of premises. First, according to plaintiff, Dawnland's impermissible plan to [ ] (also known as Dawnland's "[ ]") was a necessary underpinning to a great number of high evaluation scores received from the evaluation panel. Second, plaintiff alleges that if Dawnland's grab and go operation were rated by the panel as [ ] (also known as Dawnland's "[ ]"), Dawnland's proposal would have been scored much lower in a number of evaluation factors. Third, plaintiff contends that the evaluation panel did not understand Dawnland's grab and go [ ] or the

---

[12]/  There is no dispute that in the Draft Contract the Park Service clearly requires Dawnland's grab and go operation to take place in the retail area of Jordan Pond House. AR at 1852. The court relies on the prospectus, however, for this proposal requirement, rather than on subsequent actions of the NPS. *See id.* at 111, 191.

requirements of the prospectus, and that its evaluation of Dawnland's proposal was therefore irrational.

The record shows, however, that Dawnland proposed [ ] (its "[ ]" and its "[ ]"); that many aspects of its grab and go service (and its other retail operations at Jordan Pond House) would have been similar [ ]; and that the evaluation panel did not rely only on [ ] for its evaluation of Dawnland's retail operations.  Further, despite plaintiff's strained analysis of the record, there is no evidence that the evaluation panel misunderstood Dawnland's proposed grab and go [ ] or the requirements of the prospectus.

The parties have expended enormous effort parsing artist renderings, blueprints, proposal text, square footage requirements, and the evaluation panel's rating of PSF2(a).  The court has considered these arguments and agrees with defendant and intervenor-defendant that there is no error in the evaluation of proposals which can be traced to Dawnland's [ ].

The court notes that Dawnland offered [ ], AR at 868-69, 884-85, but provided that the menu [ ] would be the same, *id.* at 869.  Nor did the evaluation panel misunderstand Dawnland's proposed [ ]:

[ ]

*Id.* at 1740.  As to specific commentary comparing Dawnland's [ ] proposal to [ ] proposed by other offerors, the panel "[ ]." *Id.* at 1751.  To explain Dawnland's high rating on all four aspects of its retail operations, not just its grab and go [ ], the panel stated that Dawnland "[ ]." *Id.* at 1752.  There is no record evidence that the evaluation panel relied more on Dawnland's [ ] for a [ ] than on Dawnland's [ ] to produce this "excellent" rating for PSF2(a).

The court therefore rejects plaintiff's contentions that the evaluation panel misunderstood Dawnland's grab and go [ ] proposal, that the evaluation panel misunderstood prospectus requirements, and that the evaluation panel erred in its evaluation of Dawnland's grab and go operation.  As to plaintiff's related arguments, that many other evaluation factors, and other aspects of Dawnland's retail operations, were dependent on [ ] for Dawnland's grab and go [ ], the court finds these arguments to be too speculative to have merit.  It is certainly true that

25

Dawnland's grab and go [ ] cannot be viewed in isolation, because all of the Jordan Pond House retail operations are affected by the [ ], and a [ ], for example, is not available under Dawnland's "[ ]."  The court does not read the record, however, to show a single evaluation error traceable to Dawnland's [ ].

## b.    No Unstated Evaluation Criteria in Retail Operations

Plaintiff alleges that the evaluation panel erred, Pl.'s Mot. at 24-25, Pl.'s Reply at 36, when it preferred Dawnland's explanation of "[ ]" over the other offerors' proposals.  AR at 137.  According to plaintiff, the evaluation panel impermissibly rated the "[ ]" aspect of Dawnland's marketing plan, instead of limiting its rating to the "where" and "how" aspects specifically denoted in Principal Selection Factor Subfactor 2(a) (PSF2(a)):

> The Prospectus very specifically requested offerors to describe "where" and "how" they would provide retail operations, but never asked them to [ ].  Thus, in its evaluation, the Panel improperly created a new requirement for the Prospectus that fit with Dawnland's proposal and then gave Dawnland bonus points for complying with this newly invented term.

Pl.'s Mot. at 24-25.  Plaintiff's argument suggests that pursuant to the terms of the prospectus the evaluation panel could not consider anything beyond the location ("where") and method of display ("how") of these retail items in the offerors' proposals.

The court reads the prospectus differently.  PSF2 begins with an explanation of the objectives of retail operations, which are to provide "visitors [with] the opportunity to purchase items that will help ensure their safety while visiting the Park as well as items that will prolong the memory of their visit to the Park."  AR at 137.  To this end, PSF2(a) inquires into the "merchandising plan" of the offeror.  *Id.*  The specific provision relied upon by plaintiff notes the Park Service's interest in how each offeror would "improve the visitor's onsite experience at Acadia National Park, at a reasonable range of price points."  *Id.*  As the court reads PSF2(a), the evaluation subfactor contains an implicit query as to [ ], and is not limited to the identification of retail stock locations and methods of display.

The court finds no unstated criteria in the scoring of PSF2(a) by the evaluation panel, which preferred Dawnland's proposal, in part, because Dawnland "[ ]." AR at 1751. The evaluation panel correctly rated Dawnland's explanation of the [ ], because the [ ] is implicit in a request for the specifics of a marketing plan:

> As this court has stated, [w]hen weighing the merits of a proposal under a specific evaluation factor, an agency may consider all matters that offerors would reasonably have believed to be within the scope of the factor. Furthermore, agency evaluation personnel are given great discretion in determining the scope of an evaluation factor. As this court has often found, a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.

*Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 327-28 (2009) (internal quotations and citations omitted, alteration in original). For this reason, the court's rejects plaintiff's challenge to the evaluation panel's scoring of PSF2(a).

### c.   Management of Food Service Infractions

Principal Selection Factor Subfactor 3(b) (PSF3(b)), titled "Violations or Infractions," states that:

> The Service is aware that any business may receive the occasional audit deficiency, notice of violation, penalty, fine, less than satisfactory public health rating, or similar regulatory notice from a federal, state, or local agency (hereinafter collectively referred to as "Infractions"). The Service is interested in understanding how your business manages these Infractions.

AR at 140. Offerors having received infractions in the last five years were directed to provide detailed information on each of those infractions and the offeror's response to those infractions. *Id.* The Park Service included instructions for

offerors that had received no infractions for the last five years: "[E]xplain how you would respond if you do receive an Infraction and the process you would follow to resolve such Infractions and minimize future occurrences." *Id.*  Jordan Pond complains that the evaluation panel erred in giving Dawnland and [ ] the same rating as Jordan Pond for PSF3(b), because Jordan Pond had no infractions whereas Dawnland had [ ] infractions and [ ] had [ ] infractions.  Pl.'s Mot. at 29-30 & nn.12-13, 35-37 & n.15; Pl.'s Reply at 38-41.

Plaintiff's argument has no merit.  The prospectus does not require the Park Service to score PSF3(b) based on the *number* of infractions received by an offeror.  The NPS could rationally rate the *management* of infractions by these three offerors to be equal.  Plaintiff may disagree with the formulation of the selection subfactor, but such a challenge to the prospectus is untimely because it is lodged after proposals had been submitted to the Park Service.  *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1313-14 (Fed. Cir. 2007).  Plaintiff may also disagree with the agency's technical judgment as to the importance of infractions, but such a disagreement is not sufficient to invalidate the selection decision here.  *See, e.g.*, *E.W. Bliss*, 77 F.3d at 449 (stating that "technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess").  For these reasons, the court rejects plaintiff's challenge to the scoring of PSF3(b).

### d.   Miscellaneous Disagreements with the Agency's Technical Judgment

Aside from the issues addressed thus far in this opinion, plaintiff also attempts to discredit the evaluation scores won by Dawnland's proposal and [ ]'s proposal.  None of these arguments is persuasive.  There are two broad themes in these arguments.  First, according to plaintiff, Jordan Pond's proposal was superior, and its experience as the incumbent concessioner in Acadia was superior to Dawnland's and [ ]'s concessioner experience.  Second, plaintiff alleges that the evaluation panel's analysis was superficial, erroneous, contradictory and unfair.  The court will briefly address these arguments.

Plaintiff argues, for example, that its plan for providing healthy food options was equivalent to [ ]'s, thus invalidating [ ]'s higher score for this selection subfactor.  Pl.'s Mot. at 28-29 & n.11.  Similarly, plaintiff asserts that Dawnland's

plan for [ ] did not merit high ratings, because, in part, it "conflicted with the traditional appearance of Jordan Pond House." *Id.* at 18; *see also id.* at 46 (characterizing "Dawnland's highly-regarded plan to [ ] [as] infeasible"). Plaintiff also finds fault with the evaluation panel's assessment of [ ]'s financial strength; in plaintiff's view, there should have been a greater difference than [ ] points between Jordan Pond's rating on this selection factor and [ ]'s rating. Pl.'s Reply at 42. The court finds no errors in the evaluation panel's ratings challenged in these arguments.

Each of plaintiff's arguments relies on a subjective disagreement with the agency's perspective as to the "[r]elative [q]uality" of information presented in the offerors' proposals. AR at 1636. The evaluation panel's report does not show evidence of unsupported or irrational ratings for the aspects of proposals that plaintiff challenges here. The court defers, as it must, to the agency's expertise in rating the technical aspects of proposals. *See, e.g.*, *E.W. Bliss*, 77 F.3d at 449. Furthermore, plaintiff's arguments have not convinced the court that it would have rated the proposals any differently on the contested evaluation factors, even if the court could substitute its judgment for that of the agency.

Defendant characterizes plaintiff's challenge to evaluation ratings as "subjective and conclusory," and the court must agree. Def.'s Mot. at 39. Intervenor-defendant concludes that "[t]aken as a whole, . . . Plaintiff's protest raises no substantial basis to support its claim that the Evaluation Panel's scoring of proposals was not reasonably based." Dawnland's Reply at 17. The court must again agree. Plaintiff has not met its burden to show that the evaluation panel's scoring of proposals shows that "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [that the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Alabama Aircraft*, 586 F.3d at 1375 (citation omitted).

As to plaintiff's arguments regarding the ratings of the offerors for Principal Selection Factor Subfactor 3(a) (PSF3(a)), titled "Iconic Food Service Dining Experience," AR at 139, plaintiff appears to believe that the incumbent advantage enjoyed by Jordan Pond could not be overcome, *see* Pl.'s Mot. at 33 (describing Jordan Pond as having "*perfect* qualifications"). According to plaintiff, Dawnland lacks the requisite experience of running a very busy full-service seasonal

restaurant in a national park.  Pl.'s Mot. at 33-35 & n.14.  Plaintiff therefore
describes the equal ratings received by Jordan Pond and Dawnland on PSF3(a) as
irrational.  *Id.* at 34.

Neither the prospectus nor the internal guidance documents used by the Park
Service shows an intent to provide the incumbent contractor an insurmountable
advantage.  In relevant part, PSF3(a) states that:

> The Service is interested in preserving the unique history
> of the Jordan Pond House and also ensuring its
> traditional "tea house" service of the 1930s continues to
> appeal to contemporary visitors . . . .  During a short
> operating season, the Concessioner serves a large volume
> of visitors at the Jordan Pond House.  The Service desires
> a Concessioner with capabilities to adapt quickly to the
> existing operating environment and plan for changes to
> keep the tradition at the Jordan Pond House fresh. . . .

> [P]rovide two examples of your experience in the
> operation and management of dining locations that
> demonstrate your ability to operate the Jordan Pond
> House, particularly its concentrated visitor use patterns
> and its traditional "tea house" service. . . .

> Explain how this experience makes your organization a
> suitable operator of a high volume, unique restaurant like
> the Jordan Pond House.

> Explain the nature of the operation when you assumed
> operations and what changes you were able to introduce
> to improve the operations (internally and for your
> customers) while at the same time maintaining certain
> pre-existing aspects of the operation that drew customers.

AR at 139-40.  Although this selection subfactor focuses on the offeror's capability
to operate a seasonal, high-volume restaurant with cherished traditions, the court
does not consider this subfactor to require that the non-incumbent offeror have

perfectly equivalent experience in order to merit a high rating.  Indeed, competition for government contracts generally requires that incumbents compete on equal footing with other suitably qualified offerors, and this principle is enshrined in regulations pertinent to this competition.  *E.g.*, 36 C.F.R. §§ 51.6, 51.16, 51.17.

Further, the internal guidance documents used in this competition also reflect that an incumbent's knowledge of the concession should not unduly advantage that offeror's proposal ratings.  For example, these instructions state that the precision and comprehensiveness of an incumbent's maintenance plan may not be better than the less-detailed but equally effective maintenance program of a non-incumbent; scoring on this aspect of a proposal should not unfairly advantage the incumbent's access to non-public information regarding concession operations.  AR at 1644.  The court finds nothing in the relevant regulations, the prospectus or the NPS internal guidance documents which suggests that the incumbent concessioner should necessarily score higher than non-incumbents on the "Iconic Food Service Dining Experience" evaluation subfactor.

Here, the evaluation panel praised all three offerors' experience and capabilities relevant to running an iconic restaurant in a national park.  The panel noted differences in experience but decided that equal ratings should be given to the offerors in PSF3(a).  The following excerpts capture the panel's reasoning, which is not arbitrary or capricious:

[ ]

AR at 1766-67.  Although plaintiff disagrees with the judgment of the agency, Jordan Pond has not met its burden to show that the evaluation of proposals on PSF3(a) was arbitrary or capricious.

Plaintiff also attacks numerous scores in the evaluation panel's report by characterizing the conclusions reached by the panel as superficial, erroneous, contradictory and/or unfair.  The court has examined each of these allegations and finds them to be without support in the record.  Only one instance cited by plaintiff merits additional discussion, that of an alleged internal contradiction in the rating of Principal Selection Factor Subfactor 1(a) (PSF1(a)), titled "Resource Education for Visitors and Employees."  AR at 136.  The particular aspect of this evaluation

31

subfactor highlighted by plaintiff is the offeror's proposed measurement of success in resource education.  Pl.'s Mot. at 16-17; Pl.'s Reply at 41-42.

Plaintiff seizes upon two related excerpts from the evaluation of PSF1(a) in the panel's report and finds them contradictory.  The first excerpt states that when Dawnland "[ ]."  AR at 1736.  The second selection states that "[ ]."  *Id.*  Dawnland's superior rating in PSF1(a) is supported, among other reasons, by the panel's conclusion that Dawnland provided "[ ]."  *Id.*

The parties dispute the meaning of this section of the evaluation report.  In plaintiff's view, a finding of equivalence was replaced by an inconsistent finding of superiority on the same issue of the measurement of success in resource education.  In defendant's and intervenor-defendant's view, the finding of equivalence was limited to the use of [ ], whereas the finding of superiority concerned [ ] proposed by Dawnland.  Def.'s Mot. at 35-37; Dawnland's Mot. at 27-28.  The citations to the record provided by these parties, Def.'s Mot. at 37; Dawnland's Mot. at 28, show that the evaluation panel was able to rationally distinguish between [ ] and the [ ].  The court finds nothing in the panel's evaluation of PSF1(a) to be contradictory, irrational, arbitrary or capricious.

### e.  Jordan Pond's Third-Place Evaluation Ranking Survives Review

The court has reviewed the selection factors outlined in the prospectus, the proposals submitted by Dawnland, [ ] and Jordan Pond, and the evaluation conducted by the Park Service.  Having considered all of plaintiff's arguments, the court does not consider the evaluation of proposals to have been arbitrary or capricious.  Dawnland's selection for award, [ ]'s second-place evaluation score and Jordan Pond's third-place finish survive this court's scrutiny.  The record reflects a rational evaluation process that evinces only two minor non-prejudicial errors.  The court turns now to plaintiff's final argument – that an infirmity in the composition of the evaluation panel caused the panel to make numerous evaluation errors.

### 3.  Evaluation Panel Composition Was Valid Despite a *De Minimis* Deviation from Internal Guidelines

32

Plaintiff asserts that the evaluation panel had a technical advisor from Acadia National Park assigned to it, but that this person did not adequately assist in the evaluation of proposals.  Pl.'s Mot. at 5, 7-9; Pl.'s Reply at 42-44; Tr. at 20-23.  The technical advisor, [ ], was contacted sometime after the prospectus issued, along with other panel members, and agreed to serve.  AR at 1613.  Although many of the panel members signed a "Conflict of Interest and Confidentiality Certificate" before or as the evaluation panel convened on December 3, 2012 in Philadelphia, *id.* Tab 9, [ ] did not sign her certificate until April 15, 2013, *id.* at 1627, approximately three and a half months after the evaluation panel report had been finalized.  Plaintiff concludes that [ ], the only representative of Acadia assigned to the evaluation panel, was not shown any confidential information from Dawnland's proposal as the evaluation of that proposal occurred, and that the evaluation process therefore lacked important expertise.  *See* Pl.'s Reply at 43 (stating that "the record clearly shows that the Panel concluded that it did not need any such local assistance given that the local advisor did not sign her confidentiality agreement until long after the Panel had written its report and thus she could not be shown any aspects of the proposals prior to the Panel reaching its conclusion and disbanding") (citations omitted); Pl.'s Mot. at 46 (stating that "if the Panel had actually used the Technical Advisor from Acadia National Park to validate Dawnland's assertions give[n] that she was specifically designated because of her knowledge of the area and operations, many of these [evaluation] errors [by the panel] would not have occurred"); Tr. at 23 (asserting that [ ] "was not properly utilized because the panel made, not just one, but numerous mistakes that had it been properly taking advantage of the local knowledge, it shouldn't have made").

The court agrees with plaintiff that the Park Service did not follow its internal guidance procedures as to the utilization of [ ] and her expertise, but does not read the record to show that this was anything more than a *de minimis* procedural misstep.  [ ] made at least one concrete contribution to the evaluation panel's work – she supplied the panel with a document titled "Brief Overview of Important Points and Challenges" regarding the concession contract at Acadia.  AR at 1658-70.  The evaluation report also states that [ ] served as a "non-voting remote technical advisor who assisted the panel as needed."  *Id.* at 1721; *see id.* at 1630 ("The [Acadia] technical advisor is [ ].  [ ] will be available via phone throughout the week with any questions.").  The panel also included an "on-site" technical advisor from the Northeast Regional office of the Park Service who was

present when the proposals were evaluated. *Id.* at 1721. The record does not show, however, that either of these technical advisors assisting the panel submitted a signed certificate regarding confidentiality and conflicts of interest by the first day that the panel convened.

According to the internal guidance documents used by the panel chair, "technical advisors are required to sign a Conflict of Interest and Confidentiality Certificate Agreement prior to the start of the evaluation." AR at 1631. The input of technical advisors into an evaluation varied depending on the needs of the panel:

> Technical advisors review proposals as directed by the chair and, when requested, provide technical information and advice to the panel (e.g., the scope of existing concession operations, environmental regulations, and financial analysis). Technical advisors may also participate in the drafting of the evaluation summary when requested by the chair. Technical advisors only participate in the panel's proposal scoring discussions to provide information regarding questions of fact, not regarding the scores themselves or the comparison of proposals.

*Id.* at 1630. The record does not specify how much, if any, access [ ] and the other technical advisor had to confidential information in Dawnland's proposal while the evaluation of that proposal took place, and the record does not specify the level of consultation provided to the panel by these technical advisors. The record does show, however, that the Park Service did not follow its procedures for obtaining a conflict of interest and confidentiality certificate from the technical advisors. Plaintiff does not allege that this failure to follow a non-binding guidance document, in itself, invalidates the selection decision of the Park Service. *See* Pl.'s Reply at 44 (stating that such failures "are not in and of themselves violations of law"). Instead, plaintiff alleges that the Park Service lacked adequate local expertise to make informed decisions when evaluating Dawnland's proposal.

Plaintiff's argument fails for two reasons. First, the evaluation panel contained adequate expertise, whether or not [ ] had access to confidential information in the offerors' proposals, to rate Dawnland's proposal against the

34

evaluation factors and subfactors which were explained in abundant detail in the prospectus, and which follow a standard evaluation scheme established by regulation for all NPS concession contract awards. The panel included seven voting members who worked in concessions oversight for the Park Service. AR at 1721. The voting members of the panel included an attorney and a Certified Public Accountant, and many of the voting members of the panel had served on similar panels in the past. *Id.* Tab 8. It is pure speculation on the part of plaintiff that the panel would have scored Dawnland's proposal differently if someone from Acadia had played a greater role in the evaluation process.

Second, the evaluation "errors" that plaintiff blames on the composition of the evaluation panel consist, except for the evaluation of the sourcing of [ ] and native sturgeon roe, of rational technical judgments of the panel with which Jordan Pond disagrees. The court cannot disturb these technical findings of the agency unless they are proved to be irrational or arbitrary, a burden which plaintiff has not met here. The catalogue of evaluation "errors" that plaintiff attributes to the lack of local expertise, Pl.'s Mot. at 46, are not substantiated by the record except in two minor, non-prejudicial instances. The failure to obtain conflict of interest and confidentiality certificates from the panel's technical advisors is, therefore, nothing more than a *de minimis* failure to follow non-binding evaluation procedures. *De minimis* errors in an agency's consideration of proposals do not justify relief from this court. *E.g.*, *Grumman Data*, 88 F.3d at 1000 (citation omitted).

## CONCLUSION

Plaintiff has not shown that the Park Service's selection decision was arbitrary, capricious, or an abuse of discretion, or that Jordan Pond was prejudiced by any evaluation errors or procedural flaws in the evaluation process.

Accordingly, it is hereby **ORDERED** that

(1)   Plaintiff's Motion for Judgment on the Administrative Record, filed January 6, 2014, is **DENIED**;

(2)   Defendant's and Intervenor-Defendant's Motions for Judgment on the Administrative Record, filed on January 25 and 27, 2014, are **GRANTED**;

(3)    The Clerk's Office is directed to **ENTER** final judgment in favor of defendant and intervenor-defendant and to **DISMISS** the amended complaint **with prejudice**;

(4)    On or before **April 4, 2014**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary or confidential marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and,

(5)    On or before **April 4, 2014**, defendant shall **FILE** the **Redacted Second Amended Administrative Record** in CD-ROM format so as to establish a proper public record of this protest.

/s/Lynn J. Bush
LYNN J. BUSH
Senior Judge

36